UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH MANCUSO and KARLA MANCUSO,
individually and as Parents and Legal Guardians of
M.M., et al.,

                                        Plaintiffs,

            -against-

DOUGLAS ELLIMAN, LLC, et al.,

                                        Defendants.

---

07 Civ. 2368 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

        Plaintiffs commenced this action, which claims violations of the Fair Housing Act, 42

U.S.C. § 3601 *et seq.*, the New York State Human Rights Law, and the New York City

Administrative Code, on March 22, 2007.  Plaintiffs' claims arise out of two attempts to rent an

apartment at 15 Broad Street in New York City, which they allege were unsuccessful because

plaintiff M.M. is in a wheelchair and has a service dog and because of plaintiffs' familial status.

Now before the Court are three sets of defendants' motions for summary judgment, as well as

plaintiffs' motion for permanent injunction and partial motion for summary judgment on

liability.  For the reasons that follow, plaintiffs' motions are DENIED; the motion of defendants

Maidan and Talel is GRANTED; the motion of defendant Stimmel is DENIED; and the motion

of defendants Kouperman, Voight, and Douglas Elliman LLC is GRANTED in part and

DENIED in part.

1

## BACKGROUND

### I.  The Parties

Plaintiffs are a family of four—Joseph Mancuso ("Mancuso"), his wife Karla Mancuso, and their two children, Max and M.M.—and CEO Clubs International, Inc. ("CEO Clubs"), a nonprofit organization managed and operated by Joseph and Karla Mancuso.  (Douglas Elliman LLC, Faina Kouperman, and Gordon Voight's Rule 56.1 Stmt. ("DE Rule 56.1 Stmt.") ¶ 1; Declaration of Joseph Mancuso dated October 25, 2010 ¶ 16.)  M.M., a minor child during all times relevant to this motion, has a disability and uses a motorized wheelchair and a service dog. (DE Rule 56.1 Stmt. ¶ 2; Pl.'s Rule 56.1 Stmt. ¶ 2, 7, 8.)

Defendant Douglas Elliman LLC ("DE") is a real estate brokerage firm with over sixty offices in Manhattan, Brooklyn, Queens, and Long Island.  (DE Rule 56.1 Stmt. ¶ 9.)  Defendant Gordon Voight was engaged by DE as a real estate salesperson from October 4, 2000, to November 2007.  (*Id.* ¶ 25.)  Defendant Faina Kouperman has been engaged in the same capacity since April 25, 2005.  (*Id.* ¶ 50.)

At all relevant times, defendant John Stimmel owned Apartment 1520 at 15 Broad Street, New York, New York ("Apartment 1520"), one of the apartments that plaintiffs attempted to rent.  (*Id.* ¶ 26.)

Defendant Michael Maidan owned Apartment 2020 in the same building, which plaintiffs also attempted to rent.  (*Id.* ¶ 51.)  In December 2006, Maidan decided to sell Apartment 2020 to defendant Emil Talel, and did so on July 12, 2007.  (*Id.* ¶¶ 53, 55.)

### II.  Apartment 1520

Plaintiffs' first attempt to rent an apartment at 15 Broad Street involved Apartment 1520. On April 4, 2006, DE, through Voight, entered into a Residential Brokerage Agreement with

Stimmel providing Voight with the exclusive right to rent Apartment 1520 from May to December 31, 2006.  (DE Rule 56.1 Stmt. ¶ 27; *see* Courtian Aff. dated September 7, 2010 ("First Courtian Aff.") Ex. T.)  In November 2006, Mancuso contacted Voight to inquire about Apartment 1520.  (First Courtian Aff. Ex. H ("Voight Dep.") at 166:15-25, 170:5-171:6.) Mancuso was in Texas at the time he first contacted Voight, and they agreed to meet when he returned to New York at Mancuso's then-current apartment at 47 West Street.  (*Id.* at 171:14-21; Courtian Aff. dated Oct. 20, 2010 ("Second Courtian Aff.") Ex. C at 171:25-172:7.)  At this meeting, Mancuso talked with Voight about CEO Clubs, his children, the service dog, his credit, and a rent offer.  (Voight Dep. at 177:5-11.)  In searching for a new place to live, the Mancusos preferred to rent as a corporation (*i.e.*, rent in the name of CEO Clubs), though Mancuso also testified that they "were flexible and could do whatever was necessary to live where [they] wanted to live."  (First Courtian Aff. Ex. C ("Mancuso Dep.") at 145:16-23.)  Mancuso also told Voight that he might need to run special wiring so that the copy machines he planned to use would not cause power outages or broken fuses.  (Mancuso Dep. at 148:24-149:10.)

At some point prior to December 11, 2006, Voight informed Stimmel of details of the Mancusos' application, including M.M.'s wheelchair and service dog, Mancuso's desire for a corporate lease, and Mancuso's intent to use the apartment as an office and a residence.  (Voight Dep. at 226-31, 324-25; First Courtian Aff. Ex. J ("Stimmel Dep.") at 66-67, 69-71, 77-78, 86-87.)  Prior to Thanksgiving, Voight also told Stimmel that Mancuso's offer was under the asking price and that Mancuso's salary was $700,000, received from a nonprofit organization.  (Stimmel Dep. at 66:14-18.)  Stimmel told Voight that "something didn't make sense on the salary," that it didn't "ring true to" him that a person could make a $700,000 salary at a nonprofit organization,

that he disfavored a corporate lease, and that he believed the building rules did not allow commercial use of the apartment.  (*Id.* at 67:8-24.)

The monthly rental asking price of Apartment 1520 varied in November 2006.  On November 1, 2006, it was $7,700; that figure dropped to $7,600 on November 8, $7,500 on November 15, rose to $8,000 on November 22, fell to $7,400 on November 26, and finally fell to $7,200 on December 3, 2006.  (Bahamonde Decl. dated Sept. 7, 2010 ("First Bahamonde Decl.") Ex. 20 at 2.)  During that time, Mancuso made several offers that were "few hundred dollars under the current listed" price.  (Mancuso Dep. at 322:23-19; *see also* Voight Dep. 185:16-187:8.)  In early December, another potential renter, Cyrus Cooper, surfaced and contacted Voight.  (Voight Dep. at 193:20-194:17.)  Cooper offered $7,200 per month to rent Apartment 1520 and to pay half of Voight's commission.  (*Id.* at 199:18-200:4.)  Cooper had no pets, one son, a $650,000 combined family income, and did not intend to run a company out of the apartment.  (First Courtian Aff. Ex. V.)

Voight advised Stimmel that three prospective tenants were interested in renting Apartment 1520, and at Stimmel's request, Voight summarized their profiles in a December 11, 2006 e-mail to Stimmel.[1]  (First Courtian Aff. Ex. V.)  That e-mail reflected that M.M. uses a wheelchair, that she would not keep the dog in the apartment, and that plastic guards would be installed to prevent damage to the doors, but did not mention a bankruptcy of which Mancuso had informed Voight.  (*Id.*; *see* First Bahamonde Decl. Ex. 7 ("Phone Call 121406") at 7:4-18.)  On December 12, 2006, Stimmel decided to rent Apartment 1520 to the Cooper family.  (DE Rule 56.1 Stmt. ¶ 40.)

---

[1] The third prospective tenant did not fill out an application, and Voight was uncertain about the tenant's employment.  (First Courtian Aff. Ex. V.)

On December 14, 2006, Mancuso called Voight and recorded the conversation, the relevant portions of which are excerpted below:

> MR. MANCUSO: Okay, I got a question for you.
> MR. VOIGHT: Uh-huh.
> MR. MANCUSO: Um, you said that the deal killer was, uh, the daughter, uh, the wheelchair and the dog.
> MR. VOIGHT: Yeah, they were really concerned about scraping up things. They—they feel bad about, you know, the daughter and everything but he was just—they—he's just trying to protect his apartment, that's all.
> . . .
> MR. MANCUSO: But he was pretty upset about that—that—is that what's holding us back from getting the place?
> MR. VOIGHT: He's, uh, he's not upset, he just, uh—
> MR. MANCUSO: Oh, he's concerned.
> MR. VOIGHT: --that's not the word.  He's just a little concerned.
> MR. MANCUSO: Yeah. Uh, is it –is it a deal killer, that's the question because if it—
> MR. VOIGHT: That's been—yeah, it's gonna be kind of the deal killer, yeah.
> MR. MANCUSO: It is a deal killer? Wow.
> MR. VOIGHT: He just—he seems to be really concerned about that—that—he's not upset. He's not angry. He feels bad for having that viewpoint because of your daughter's unfortunate situation.
> . . .
> MR. VOIGHT: . . . I really took up for you 'cause I told him, I said, look I went to your place on West Street.  I said, there's no scratches on the floor and there's no marks anywhere in the apartment as far as damaged walls or scruffed up floors with—from a wheelchair or anything.  And I pointed it out to him.  But he—this is very normal.  This is just not him.  I've had other people who have bought developments and they rented them out.  And they were totally nervous about who went in there.  Uh, another man I—I—I'm renting—I'm renting out his development, he's—he was terrified they were gonna cut—uh, stink up the place.  So there's just little things like that.  And this is very common.
> . . .
> MR. MANCUSO: I see.  So, he –this is the first time he's renting, so you think he's a little biased against, uh, this, uh, dog, uh, wheelchair?
> MR. VOIGHT: He's just nervous, period.
> . . .
> MR. MANCUSO: But I hate to lose it over the damn—I mean I—I don't mind losing it over price 'cause the price is—everybody has it.  But I feel—
> MR. VOIGHT: Well tell me—
> MR. MANCUSO: Uh, the wheelchair, uh, dog, you know, that—that's not like fair.  I mean, you know, I hate that.  But I can deal with it by the plastic strips and get rid of the dog.

MR. VOIGHT: Well, you're dealing with the first time a man has ever rented out something.

. . .

MR. VOIGHT: —they [co-ops]—it—you know they're like country clubs.  And whether they—they—it doesn't—it—the money certainly is a factor, but it's whether or not they like you.

MR. MANCUSO: Well, uh, in this case, does this guy know that you can't, uh, discriminate against disabled people? You know he could get sued.

MR. VOIGHT: Well, I—

MR. MANCUSO: I mean I'm asking you—between you and me.

MR. VOIGHT: Talked about it, but I don't think, uh—

MR. MANCUSO: It's not true in condos is it? Is that same law true?

MR. VOIGHT: I don't know. I don't think it really—he can—an owner can—we looked into that and an owner can choose whoever he wants.  That's just his right.  So I don't think—I don't think that's really a case. . . .

. . .

MR. MANCUSO:  The floor never is a problem, it's the door.  It's the door at the same height as the wheelchair where it hits the thing.  And, um, and you could get a scratch.  I mean we haven't had one in four years here.  But we go to other people who have wheelchair—kids that are disabled and some of them have these plastic covers, hard—it looks like glass—cover over a certain section of the door.  It's only about 8, 10 inches of plastic.  And, uh, if it ever hits there, it just hits the plastic and then when you leave, you just peel the plastic off.  They stick on.  They're really easy to put on, you know like glue on.

MR. VOIGHT: Uh-huh.  Well, so, that is something.  That's—that's workable.

(Phone Call 121406 at 2:21-3:6, 5:2-20, 9:15-10:5, 10:16-20, 14:10-20; 19:24-20:14, 21:15-22:5.)  Mancuso called Voight a second time and recorded that conversation as well:

MR. MANCUSO: . . . I really like the apartment and I'd like to get it, but what's the status?

MR. VOIGHT: Well, the status is, uh, we're—he—he likes this other couple.

. . .

MR. VOIGHT: And, uh, uh, we're gonna see if—uh, he liked the fact that they have just one person.  Uh, they have a—they're married and with a—with a son.

MR. MANCUSO: No dog and no wheelchair.

MR. VOIGHT: No, nothing like that.  He's very comfortable with that.

. . .

MR. VOIGHT: So I told him everything that you're willing to do.  But now the only thing that he doesn't know about—

MR. MANCUSO: All right.

MR. VOIGHT: --is I never told or talked to him about the credit.

. . .

MR. MANCUSO: But you did tell him about the dog, the wheelchair and he—he still feels the same way.  He doesn't really care.

MR. VOIGHT: It wasn't—and it wasn't—and it's just the fact that he just like this—and then likes the other couple.  He liked this other couple.  Now they—we haven't done a bill and his apartments are local.  We're just giving him first crack at it to see what happens.

MR. MANCUSO: Well, you know, I wouldn't—well what's the price, the same as mine roughly?

MR. VOIGHT: No, they're higher than you.

MR. MANCUSO: About how much higher 'cause maybe—

MR. VOIGHT: They're at, uh, 72.

MR. MANCUSO: Yeah.

MR. VOIGHT: And the second year is 7750.

MR. MANCUSO: Well, you know, I would match that, so you would know, or I'd go $100 more.

. . .

MR. VOIGHT: So, uh, anyway I've got a [sic] call into Mr. Stim[mel] and I'll run it by him.

MR. MANCUSO: All right, well tell him that I'll match or do $100 better than the other offer.

MR. VOIGHT: So you'll be at 73?

MR. MANCUSO: Yeah, I'd go 73.  I mean, you know, you know $100 is not a lot.

MR. VOIGHT: Yeah.

MR. MANCUSO: And I want to show him that we have good faith and I'm moving the dog for his sake and we would do the—you know guards for the wheelchair.  We'll be very careful with the disabled and—

MR. VOIGHT: The—the thing about it is, this is—this is what I got to point out to you Joe.

MR. MANCUSO: All right, tell me.

MR. VOIGHT: This is his first time to rent.

MR. MANCUSO: I know. And so he's neurotic about the wheelchair.

MR. VOIGHT: You got it.

MR. MANCUSO: Yeah.

MR. VOIGHT: That's what it—and I—

MR. MANCUSO: That's the real killer.  I bet if I didn't have the wheelchair and the dog, I would be in.  And you know—

MR. VOIGHT: If you didn't have anything, we already would have signed leases.

MR. MANCUSO: Really? You know I wondered why it's taken two weeks.  But we would have signed leases—

MR. VOIGHT: Yeah.

MR. MANCUSO: —and, uh—

MR. VOIGHT: This was not—he didn't feel good about it. He had nothing personally against you.

(First Bahamonde Decl. Ex. 8 ("Phone Call 121506") at 2:16-20, 3:9-17, 4:22-5:15, 10:19-12:7.)

When the Mancusos did not get Apartment 1520, Voight offered to help them find another

apartment.  (DE Rule 56.1 Stmt. ¶ 49.)

## III.    Apartment 2020

On December 11, 2006, DE, through Kouperman, entered into a Residential Brokerage

Agreement with Maidan, the then-owner of Apartment 2020, providing Kouperman with the

exclusive right to rent Apartment 2020 from December 11, 2006, to June 1, 2007.  (DE Rule 56.1

Stmt. ¶ 52.)  When Mancuso's attempts to rent Apartment 1520 failed in late 2006, he contacted

Kouperman to inquire about renting Apartment 2020.  (*Id.* ¶ 56.)  Mancuso made an offer, told

Kouperman that they lived in the neighborhood, knew the building, did not need to see the

apartment, and that he had a wife and a daughter and a dog.[2]  (*Id.* at 146:21-147:8.)

Kouperman contacted Maidan to inform him that the Mancusos were interested in renting

Apartment 2020.  (DE Rule 56.1 Stmt. ¶ 58.)  Since Maidan had advised Kouperman that he

might be selling Apartment 2020 to Talel, Kouperman also contacted Talel regarding the

Mancusos' interest.  (*Id.*)  Talel has an extreme aversion to dogs, and Kouperman was informed

that Talel was allergic to dogs.[3]  (*See* First Courtian Aff. Ex. K; Bahamonde Opp'n Decl. Ex. 15

("Talel Dep.") at 12:21-23, 13:22-14:11, 65:6-66:2; Kouperman Dep. at 149:14-19.)  Kouperman

---

[2] Mancuso testified that at this time he told Kouperman that his dog was a service dog, while DE and Kouperman contend that he did not.  (*Compare* DE Rule 56.1 Stmt. ¶ 57 *and* Kouperman Dep. at 153:25-154:11 *with* Bahamonde Decl. dated Oct. 25, 2010 ("Bahamonde Opp'n Decl.") Ex. 9 at 268:3-15.)  Kouperman contends instead that she first learned that dog was a service dog on a later phone call recorded by Mancuso.  Mancuso's own recording appears to belie his contention that he informed Kouperman before that call.  (*See* Bahamonde Opp'n Decl. Ex. 8 ("Phone Call 122006") at 8:8-11 ("MR. MANCUSO: Wow. So you've already told him it's a service dog.  You already told him all these things I'm *adding now*, you did? MS. KOUPERMAN: Uh, no, no, I have not." (emphasis added)).)  In either case, there is no evidence that Talel or Maidan was aware that the dog was a service dog before the recorded phone call with Kouperman.  (*See* Maiden Dep. at 59-60; Talel Dep. 71:4-25.)

[3] Although Talel testified that he is allergic to dogs, it appears instead that he simply has an extreme dislike for the smell of dogs.  He testified, for example, that he knows he has allergies because he "just get[s] very uncomfortable and they [dogs] smell . . . and when I smell anything related to this I get kind of get nauseous, and in addition to that, you know, when the dog would pee on the floor, the stain stays there forever and it also smells, and I tried unsuccessfully to sand down the floors in this particular area where the dog was staying and I couldn't get rid of the stain."  (Talel Dep. 13:22-14:11.)

then told Mancuso that the "owner" did not want a dog in the apartment, although she was

referring to Talel, who would later become the owner, rather than Maidan. (*Id.* at 153:7-16.)

Afterwards, Mancuso called Kouperman and recorded that conversation, relevant

portions of which are excerpted below:

> MR. MANCUSO: Okay, so I'm, uh, willing to offer eight and let's talk about
> what's a fair number for an increase.
> MS. KOUPERMAN: Okay.
> MR. MANCUSO: I—I would say 3% but I don't want to jump too high.
> MS. KOUPERMAN: Right.  But then you—you understand the condo was listed
> at 89.  So he's taking a hit of 8—he's taking a hit—and, believe  me, I mean
> 8,000, I know—I guess—I don't have to tell you.  I'm sure you know, it's
> under—under market.
> . . .
> MS. KOUPERMAN: . . . And then so what about your dog?
> . . .
> MR. MANCUSO: Okay, now let me make sure we understand the dog 'cause that
> looked like the deal killer because I think, you know, it's in our range. . . .
> . . .
> MS. KOUPERMAN: Okay. Well, uh, I—okay, because I was—the dog was just a
> no way for him.
> MR. MANCUSO: A no way?
> MS. KOUPERMAN: Yes, no way—there's no way.  He does not want a dog in
> the apartment.
> MR. MANCUSO: Well, you know, let me just make sure he understands.  This is
> a service dog that goes with my daughter who's in a wheelchair.  So let's talk
> about—
> MS. KOUPERMAN: I—I understand that.  I mean I—uh, and—uh, I understand
> that but there's no—he does not want a dog in the apartment.  If—he didn't say
> for more money he'll take a dog.  He won't take a dog for $8,900.
> MR. MANCUSO: Oh, really?
> MS. KOUPERMAN: No.  That—that is a deal breaker.  I mean there is no dog
> and there's no pets in the apartment.
> . . .
> MR. MANCUSO: I'm not being rude, but I'm just saying when you talk to him
> again, the law says a service dog can go on an airplane. . . .
> MS. KOUPERMAN: Right. It's just because he, himself, is you know, is allergic
> to dogs and stuff like that and [unintelligible] if he ever decides to occupy the
> apartment he doesn't want there to be like dog remnants in the apartment.
> MR. MANCUSO: Wow.  So you've already told him it's a service dog.  You
> already told him all these things I'm adding now, you did?
> MS. KOUPERMAN: Uh, no, no I have not.
> MR. MANCUSO: Oh, well then—

9

MS. KOUPERMAN: I haven't told him any of these—any of those things . . . .
. . .
MS. KOUPERMAN: I'll tell him everything that you told me.
. . .
MR. MANCUSO: I—I hear you.  But you just mention to him that it's illegal not
to let the dog.  I mean I don't know how you say that gently, but I'm just telling
you, but whatever.
MS. KOUPERMAN: Yeah, it is, but, uh, but he doesn't have to rent.  It's not
illegal because—
MR. MANCUSO: Oh.
MS. KOUPERMAN: —it's a—I mean it's a condo and he doesn't have to rent it
to you.
MR. MANCUSO: Oh, uh, I—I—you know, I've never been in this issue before.
You're familiar with—you work with Elliman and you rent—
MS. KOUPERMAN: No, I say that because if you're renting from a large
management company, it's a—you know this is a condo with an individual owner
and it's his choice on whether or not he allows a pet in his apartment.
MR. MANCUSO: I see. Okay well—
MS. KOUPERMAN: Uh, but I understand your point.  It's not really a pet, per se.
MR. MANCUSO: Yeah, really it's not.  I mean, uh, I'd just mention it, but you
know, in the end, he—he owns it and I've got to live with whatever he says but—
MS. KOUPERMAN: Believe me, Joe, I would love to rent—
MR. MANCUSO: Okay. All right, then I'll just wait for you.

(Bahamonde Opp'n Decl. Ex. 8 ("Phone Call 122006") at 4:14-25, 5:15-16, 6:5-8, 6:21-7:15,

7:20-8:14, 8:23-24, 9:24-11:4.)

Kouperman informed Maidan and Talel that the dog was a service dog.  (*See* Maiden

Dep. at 59-60; Talel Dep. 71:4-25.)  Maidan and Talel then decided to accept an application from

Mancuso to rent the apartment; the approval of that application was subject to, among other

things, a credit check.  (Kouperman Dep. 160:8-18; Maidan Dep 59:11-23; Talel Dep. 72:16-25.)

Prior to running the credit check, Mancuso had told Kouperman that he had had a bankruptcy in

the past caused by protracted litigation, although Kouperman did not inform Talel of this

immediately, instead opting to present Talel with "the full package" of documents, including

those Mancuso provided.  (Kouperman Dep. 161:16-162:9.)  Kouperman ran the credit check,

which reflected bankruptcy filings, an outstanding judgment of about $215,000 in favor of a

prior landlord, and an overall rating of 3.3/10 and "Declined." (Courtian Aff. Ex. BB.)

Kouperman informed Talel of the outcome of the credit check, and Talel conveyed his

displeasure at that time with the negative credit report.  (Kouperman Dep. 193:17-194:4, 195:20-

196:2; Talel Dep. 73:13-25.)  Maiden and Talel discussed the negative credit report.  (Talel Dep.

73:17-20.)  After a few days, Maiden and Talel decided not to rent Apartment 2020 to the

Mancusos.  (Maidan Dep. 59:24-60:24, 64:16-19, 119:9-17; Talel Dep. 75:4-6, 76:2-10.)

Kouperman then communicated to Mancuso that the owner decided not to rent to them because

of their poor credit report.  (DE Rule 56.1 Stmt. ¶ 67.)  In an e-mail dated January 13, 2007,

Kouperman wrote Mancuso, "After 2 days of deliberation the owner has decided not to rent the

apartment to you.  I'm terribly sorry, but he is very uncomfortable with the credit situation.  I

tried to explain everything to him, but I just couldn't get him to change his mind.  I even called

Time Equities [Mancuso's then-current landlord] for a reference, which they gave with flying

colors." (Bahamonde DE Opp'n Decl. Ex. 25.)  Afterwards, Kouperman made efforts to help the

Mancusos rent another apartment at 15 Broad Street through another broker.  (DE Rule 56.1

Stmt. ¶ 69.)

Apartment 2020 was never rented out by Maidan or Talel until Talel moved into the

apartment in 2008.  (Maidan Dep. 113:15-16; *see* Talel Dep. 4:11-21, 4:25-5:4.)

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is proper if the moving party shows that "there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In deciding whether there

is a genuine issue of material fact as to an element essential to a party's case, the court must

examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party must demonstrate that no genuine issue exists as to any material fact.  *Celotex*, 477 U.S. at 323–25.  As to an issue on which the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325 (rejecting a construction of Rule 56(c) that would require the party moving for summary judgment to produce evidence affirmatively establishing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23.  In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

**II.  Standard for Evaluating Claims Under the Fair Housing Act**

The Fair Housing Act ("FHA") makes it illegal to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . familial status."  42 U.S.C. § 3604(a).  The FHA also makes it unlawful "[t]o discriminate in the sale or rental, or to

otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of" the buyer or renter or any person associated with that buyer or renter. *Id.* § 3604(f)(1). In that context, "discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). In addition, the FHA makes it illegal "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap [or] familial status, . . . or an intention to make any such preference, limitation, or discrimination." *Id.* § 3604(c).

Claims of housing discrimination are evaluated under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4] *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). Plaintiffs must first establish a prima facie case "by showing (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *Id.* "[O]nce a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802-03). "If

---

[4] Plaintiffs contend that they have "direct proof of discrimination" and therefore are not required to establish a prima facie case under the *McDonnell Douglas* framework. (*See, e.g.*, Pl.'s DE Opp'n at 18-19.) Direct evidence of discrimination is "a 'smoking gun' attesting to a discriminatory intent." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 76 (2d Cir. 2001). Because direct evidence is "typically unavailable, plaintiffs and courts ordinarily proceed by way of the three-part burden-shifting analysis set forth in" *McDonnell Douglas*. *Id.* Presumably, plaintiffs' direct evidence of discrimination in this case are the secret recordings Mancuso made of his conversations with Kouperman and Voight. Given the factual nature of this case, the relationships between the defendants, and the conflicting evidence about the defendants' motivations, the burden-shifting framework is appropriate in this case.

Plaintiffs also argue that "even in the absence of direct proof of discrimination, the plaintiff is not required to demonstrate a prima facie case under the McDonnell-Douglas framework if the plaintiff produces circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's decision." (*See, e.g.*, Pl.'s DE Opp'n at 18.) The Second Circuit authorities that plaintiffs cite, however, merely discuss alternative ways of demonstrating a prima facie case, not ways to avoid it entirely. *See Holtz*, 258 F.3d at 77; *Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 (2d Cir. 1981). In any case, the issue is moot, as the Court finds below that plaintiffs have demonstrated a prima facie case as to both apartments.

the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action."[5]  *Id.*  "Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination."  *Id.*

### III. Claims of Discrimination in Rejecting the Mancusos' Application

### A. Apartment 2020

### i. Prima Facie Case

DE contends that plaintiffs cannot establish a prima facie case of discrimination with respect to Apartment 2020 because they were not qualified to rent it.  DE argues that (1) plaintiffs' poor credit history; (2) their income; and (3) their other, non-service pet dog render them unqualified.  (DE Mem. at 9-12.)  Plaintiffs argue that the proper inquiry is whether they were financially qualified to rent Apartment 2020 and that they meet that test.  (Pl's DE Opp'n at 21-26.)

An initial issue is whether an objective or subjective standard governs the inquiry of qualification.  DE argues that a subjective standard governs, and relies on cases that hold that "[t]o satisfy the 'qualified' element for a prima facie FHA claim, the renter must satisfy the applicable criteria that the *owner* established."  *Kennedy v. Related Mgmt.*, No. 08 Civ. 3969 (PAC), 2009 WL 2222530, at *4 (S.D.N.Y. July 23, 2009) (emphasis added); *see also McDonald v. Coldwell Banker*, 543 F.3d 498, 503 (9th Cir. 2008) ("A 'qualified' purchaser is one who meets the terms of the seller." (citing *Mitchell*, 350 F.3d at 47-48)).  Plaintiffs, on the other hand, contend that "courts have uniformly adopted a more objective standard of measuring a plaintiff's

---

[5] Plaintiffs assert that "[i]t is enough for the plaintiff to show that the articulated reasons were not the true reasons for the defendant's actions," (*see, e.g.*, Pl.'s DE Opp'n at 36), but rely on overruled case law to do so.  *Lopez v. Metro. Life Ins. Co.*, 930 F.2d 157, 161 (2d Cir. 1991), was specifically mentioned by the Supreme Court in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 512-13 (1993), as a case that wrongly held that finding that a defendant's proffered reasons are false mandates a conclusion that discrimination was the real reason for the defendant's actions.

financially [sic] ability."  (Pl.'s DE Opp'n at 26); *see Broome v. Biondi*, 17 F. Supp. 2d 211, 217 (S.D.N.Y. 1997) ("The courts have found a plaintiff to be 'qualified' for housing if he is financially able to rent or buy such housing."); *cf. Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979) (affirming district court's finding that plaintiff had made out a prima facie case because, among other things, plaintiff "could afford to purchase the space sought"). Plaintiffs therefore argue that their financial statements, the availability of a guarantor, and the rent they paid at other apartments prove that they are financially qualified.  (Pl.'s DE Opp'n at 21-26.)

On this point, the Court agrees with DE, to an extent.  When analyzing this prong of a prima facie case, courts have used as a starting point the applicable criteria that the owner has established regarding who is "qualified."  The Second Circuit in *Mitchell*, for example, used the defendants' "requirement of an 80 percent mortgage contingency" to conduct the analysis on this part of the prima facie case, although it noted that it was not clear whether the defendants' "preference for greater equity in the property was an absolute prerequisite."  *Mitchell*, 350 F.3d at 48.  Other cases, including some cited by plaintiffs, have also used relevant criteria that the owner established in analyzing the "qualified" prong.  *See, e.g.*, *Mencer v. Princeton Square Apts.*, 228 F.3d 631, 635 (6th Cir. 2000) (affirming finding that plaintiffs were not "qualified to rent" because they "failed to meet the defendant's income formula"); *Kennedy*, 2009 WL 2222530, at *5 (income had to be below a certain threshold); *Passanante v. R.Y. Mgmt. Co.*, No. 99 Civ. 9760 (DLC), 2001 WL 123858, at *5 (S.D.N.Y. Feb. 13, 2001) (Section 8 rent subsidy); *Burks v. Eagan Real Estate Inc.*, 742 F. Supp. 49, 53 (N.D.N.Y. 1990) ("[T]he defendants requested . . . financial statements . . . .  Neither the prospective buyer nor the subject entities ever tendered such financial statements . . . .  [T]herefore [plaintiff's] complaint could be

dismissed on that basis alone."); *Jiminez v. Southridge Co-op., Section I, Inc.*, 626 F. Supp. 732 (S.D.N.Y. 1985) ("Accordingly, it appears that, as of July 1985, plaintiff had not demonstrated that he met Southridge I's employment stability requirement."). Under this case law, it is clear that the "qualified" prong is not limited to an objective analysis of a prospective renter's ability to pay.

This is not to say, as plaintiff protests, that "a landlord or property owner could always escape liability from claims of housing discrimination by crafting a set of amorphous criteria, conveniently and only after conducting discovery, and designed in such a way that the plaintiff could never satisfy." (Pl.'s DE Opp'n at 25-26.) The owner-established criteria in the above-cited cases were not post-hoc rationales concocted to cover intentional discrimination. Rather, they were objective requirements, often long-standing ones, clearly communicated to potential renters or purchasers of property that relate to that person's ability, financial or otherwise, to purchase or rent the property in question. *See, e.g.*, *Mencer*, 228 F.3d at 635 (noting that the income formula "as well as [defendant's] refusal to combine marital income or accept Social Security Disability Income[] were policies of long standing"); *Kennedy*, 2009 WL 2222530, at *1 (income eligibility posted in advertisements); *Passanante*, 2001 WL 123858, at *2 (noting that plaintiff "was informed that his application would be cancelled if he did not submit evidence of his Section 8 subsidy"); *Burks*, 742 F. Supp. at 53 (defendants requested financial statements); *Jiminez*, 626 F. Supp. at 733 (noting that "Plaintiff concedes that he read, understood and agreed to be bound by defendant's terms," including employment stability requirement).

Two of DE's arguments as to the insufficiency of plaintiffs' prima facie case fail because they fail to identify one of these objective criteria that plaintiff failed to satisfy. First, DE argues that Mancuso's bad credit report renders him unqualified to rent the apartment. But DE does not

articulate, nor does the record reveal an objective rule by which any defendant decided what constituted "good" and "bad" credit.  To allow plaintiffs' case to be dismissed on this ground would allow subjective criteria to define "qualified" in the prima facie case and would subvert the purpose of the second and third steps of the burden-shifting framework.  Second, DE argues that Mancuso lacked the requisite income to rent Apartment 2020.  But, again, the record reveals no point at which any defendant revealed to Mancuso any income threshold relevant in this case, distinguishing this case from those such as *Jiminez*.  DE's third argument is that the Mancusos had a different dog that is a pet, not a service dog, which fails to satisfy defendant Talel's no-dog criterion.  On this point, DE has not marshaled any evidence that indicates that the Mancusos would have brought that dog into Apartment 2020 or that the defendants were aware that the pet dog would be brought into the apartment.

For their part, plaintiffs have adduced evidence that they submitted all the required documentation and were able to pay similar levels of rent before and after applying to rent Apartment 2020.  The Court, therefore, finds that plaintiffs have satisfied their burden on this prong of the prima facie case.  There is no dispute as to the rest of the elements of the prima facie case, and therefore plaintiffs have articulated a prima facie case as to Apartment 2020.[6]

### ii.  Legitimate, Non-discriminatory Reason

The burden then shifts to defendants to articulate a legitimate, non-discriminatory reason for failing to rent Apartment 2020 to Mancuso.  "Of course, the defendants' burden in this regard is one of production, and not proof."  *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 569 (E.D.N.Y. 2007).  Defendants have satisfied their burden by adducing evidence that Mancuso's bad credit

---

[6] Maiden and Talel argue that plaintiffs can satisfy only one element of the prima facie case, but cite to inapplicable law for the elements.  *Johnson v. Citibank*, 234 F.3d 1262 (2d Cir. 2000), recites the elements of a prima facie case under 42 U.S.C. § 3605, not the provision at issue here, namely § 3604.

report dissuaded them from renting to him.  (*See, e.g.*, Maidan Dep. 59:24-60:24, 64:16-19, 119:9-17; Talel Dep. 75:4-6, 76:2-10.)

### iii. Pretext

The burden therefore shifts back to plaintiffs to demonstrate that the defendants' explanation is pretextual and that prohibited discrimination occurred.[7]  Plaintiffs offer several pieces of evidence on this point: (1) plaintiffs were asked to submit a rental application even though Mancuso had already informed Kouperman of his poor credit history; (2) Maidan and Talel took days to reject Mancuso; (3) Kouperman, Maidan, and Talel's version of events differ with respect to who was ultimately responsible for rejecting Mancuso's application; and (4) Maiden and Talel have not required the financial documentation from other prospective tenants that they required of Mancuso.  Plaintiffs' evidence, however, is insufficient to allow a reasonable jury to conclude that prohibited discrimination occurred in denying Mancuso's application.

Neither the time to deliberate nor the difference in the accounts of who was responsible for rejecting Mancuso's application indicate that prohibited discrimination occurred.  Whether it was Maidan or Talel who ultimately decided to reject Mancuso, both cited Mancuso's credit history as the reason for the denial.  (*See* Maidan Dep. 59:24-60:24, 64:16-19, 119:9-17; Talel Dep. 75:4-6, 76:2-10.)  Nor does the two days it took Maidan and Talel to decide to reject

---

[7] Plaintiffs suggest that the burden rests with defendants on the third step of the *McDonnell Douglas* framework. (*See, e.g.*, Pl.'s DE Opp'n at 38 (citing *Crawford v. Metropolitan Impex, Inc.*, No. 84 Civ. 3495 (WCC), 1985 WL 3043, at *3 (S.D.N.Y. Oct. 7, 1985) ("However, while the ultimate burden is on Crawford to demonstrate that Heller's explanation is not the true reason for defendant's actions, in the context of this motion of summary judgment, the burden is on Metropolitan to show that there are no genuine issues of material fact with respect to the issues of pretext.")).)  It is clear, however, that in the burden-shifting framework, "plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," and that "the ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited . . . discrimination occurred."  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

Mancuso imply that their explanation was pretextual.  Delay on its own does not allow for a reasonable inference of discrimination.

Plaintiffs' first and fourth pieces of evidence also do not show prohibited discrimination. Those arguments imply that Maidan and Talel initially rejected plaintiffs' rental application because the Mancusos had a dog and, upon learning that it was a service dog, asked for a credit report which they could use as a pretextual reason to again deny the application.  That is, plaintiffs allege disparate treatment because of M.M.'s handicapped status; while other prospective tenants did not have to submit a credit report, plaintiffs were subjected to a pretextual request for one.  In support, plaintiffs submit a single rental application of another of Maiden's tenants that lacked a credit report.[8]  (*See* Bahamonde DE Opp'n Decl. Exs. 33.)

It is not clear that a single instance of disparate treatment can suffice to show pretext in a discrimination case.  *See Divers v. Metro. Jewish Health Sys.*, No. 06-CV-6704 (RRM)(JMA), 2009 WL 103703, at *12 (E.D.N.Y. Jan. 14, 2009) ("This one instance of disparate treatment is not evidence sufficient to persuade a rational trier of fact to infer that MJHS's rationale for denying Divers' transfer was a pretext for discrimination."); *Blake v. Johns Hopkins Univ.*, Civ. A. No. HAR 93-2458, 1994 WL 617294, at *4 n.4 (D. Md. Oct. 25, 1994) ("[O]ne instance of alleged disparate treatment does not constitute discrimination.").  But even if it could, the individuals to whom Mancuso "attempts to compare [him]self must be similarly situated in all material respects."  *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997); *see also Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 575 (S.D.N.Y. 2010) ("Absent some evidence that other employees 'similarly situated in all material respects' were treated differently, the mere fact that one employee suffered some non-facially-discriminatory disparate

---

[8] Plaintiffs also points to other Maidan tenants who did not have to submit other financial documentation.  (*See* Pls.' DE Opp'n at 45.)

treatment cannot prove pretext." (quoting *Ferrand v. Credit Lyonnais*, No. 02 Civ. 5191(VM), 2003 WL 2251313, at *8 (S.D.N.Y. Sept. 30, 2003))).  The rental application on which plaintiffs rely is not such an example; there, the applicant's employer pledged to pay $10,000 of the applicant's rent for nine months of his lease.[9]  (*See* Bahamonde DE Opp'n Decl. Ex. 33, at DE 1033.)

Next, plaintiffs advance a disparate treatment theory with respect to the credit reports that were received, arguing that Maidan has accepted other tenants with bad credit.  Plaintiffs point to an accepted application in which the applicant's credit report reported a number of negative factors in support of their argument.  (*See* Bahamonde DE Opp'n Decl. Ex. 34 at DE1312.)[10] DE, Maidan, and Talel contend that this argument is misplaced because that individual's application did not reveal a credit report with a rating of "Declined" and bankruptcies.  (DE Reply at 17; Maidan and Talel Reply at 4.)  The Court agrees.  Although the application plaintiffs cite does list a number of credit risk factors, it is difficult to maintain that those risk factors make that applicant "similarly situated in all material respects" to an applicant with bankruptcies and a rating of "Declined."  *Shumway*, 118 F.3d at 64.

Finally, plaintiffs direct a disparate treatment argument at Talel, asserting that because he did not demand credit reports from two of his tenants, they should be allowed to proceed on a disparate treatment theory.  But these tenants are also not proper comparators to Mancuso.  Talel

---

[9] At oral argument and in a letter after oral argument, DE asserted that the applicant was also not similarly situated because he had lived in France for seventeen years before applying for the apartment.  (*See, e.g.*, Letter of Jennifer B. Courtian to the Court dated March 15, 2011 at 2 ("As the documentation reflects, the tenant of Apartment PH3S lived in France for some 17 years before he applied for the Apartment and, as such, the standard U.S. credit check would not make sense.").)  However, DE's counsel curiously did not provide any admissible evidence to support this assertion, and Bahamonde Opposition Declaration omits the pages of the applicant's application that presumably contain this information.  Although his prior residence in France would constitute another reason why the applicant was not similarly situated to Mancuso, without some evidence on point, the Court cannot evaluate this factual assertion.

[10] The credit report lists as negative factors: the level of delinquency on accounts; a high proportion of balances to credit limits; the number of accounts with delinquency; the length of time the accounts have been established; and the number of inquiries on the applicant's credit file.  (Bahamonde DE Opp'n Decl. Ex. 34 at DE1312.)

testified that he did not take a rental application at all from the first tenant because he already lived in 15 Broad Street, "just in a different floor." (Talel Dep. at 40:4-9.) The second tenant is even less similarly situated; Talel testified that he "was told by real estate people that . . . since [the prospective tenant] is not an American citizen, he doesn't have any credit history" and the prospective tenant also agreed to pay his rent in advance for a year. (Talel Dep. at 42:24-43:9.)

In light of all of the evidence, plaintiffs have failed to show that a reasonable jury could conclude that discrimination was the real reason that defendants rejected Mancuso's application for Apartment 2020. Summary judgment is therefore granted to defendants with respect to the discrimination claims on Apartment 2020.

## B. Apartment 1520

### i. Prima Facie Case

DE and Stimmel contend that Mancuso was not qualified to rent Apartment 1520 for several reasons: (1) Stimmel was suspicious of the Mancusos' claims that they earned $700,000 per year running a not-for-profit business out of their home; (2) income insufficiency; (3) Stimmel did not want a corporation to sign the lease, but Mancuso preferred to rent in the name of CEO Clubs; and (4) Stimmel did not want to rent to a tenant who needed to have an electrician come and examine the apartment, but Mancuso had indicated that special wiring might be needed to accommodate his home office. (DE Mem. at 24; *see* Stimmel Mem. at 7-11.)

Their arguments are similar to the arguments made with respect to Apartment 2020 and fail for similar reasons. The first and fourth arguments made above fail to set forth objective criteria that the owner communicated to prospective tenants as preconditions for renting Apartment 1520. Stimmel's belief regarding the $700,000 salary supposedly earned by Mancuso may constitute a legitimate, non-discriminatory reason for denying Mancuso's application, but to

use that to decide the prima facie case subverts the second and third steps of the burden-shifting process.  The same is true for Stimmel's desire not to have an electrician examine Apartment 1520; defendants do not contend that Stimmel had a no-electrician policy that was communicated to the Mancusos as a precondition of tenancy.

The remaining two arguments are a matter of some dispute.  Stimmel claims that "[t]here is no question that plaintiffs needed to lease the apartment in the name of one of their corporations in order to obtain the tax 'benefit' of deducting the rental expense as corporate deduction."  (Stimmel Mem. at 8.)  Indeed, it appears that the Mancusos did have a practice of renting apartments in corporate names to reap an income tax benefit.  (*See* Phone Call 121406 at 6:17-25 (Mancuso describing how corporate leases enable him to deduct taxes); Stimmel Decl. Exs. K (showing that the Mancusos rented their apartment at 47 West Street in the name of CEO Clubs, Inc.), L (lease between 180 Varick Street Corporation, landlord, and The Center for Entrepreneurial Management).)  But at the same time, no party has adduced evidence compelling the conclusion that Mancuso was entirely unwilling to rent in his own individual name, and Mancuso testified that he was willing to do "whatever was necessary to live where [they] wanted to live."  (Mancuso Dep. at 145:16-23.)

Stimmel also claims, based on Mancuso's tax returns, that "the Mancuso's *entire income* was only a fraction of the amount of the rent."  (Stimmel Mem. at 9 (emphasis in original).)  Mancuso, in contrast, claims that "[t]he evidence clearly demonstrates Plaintiffs [sic] capability of meeting the financial obligations of renting apartment 1520."  (Pl.'s Stimmel Opp'n at 18.)  In plaintiffs' estimation, this is because they "received letters of recommendation from their 4 previous landlords," "*one* of their corporations grossed in excess of $660,000 in 2005, and Plaintiffs held over $600,000 in cash, a portion of which they were willing to transfer into an

escrow account to cover the total cost of the least," and "Plaintiffs had a guarantor who was willing and able to co-sign a lease with them."  (*Id.* (emphasis in original) (internal citation omitted).)  Plaintiffs also note that they paid a higher rent both before and after they applied for apartment 1520.  (*Id.* at 18-19.)  At least for purposes of the prima facie case, plaintiffs have carried their burden of showing that they are qualified.  *Cf. Woodman*, 411 F.3d at 76 (noting that under the *McDonnell Douglas* framework, the prima facie burden is "minimal" and "de minimis").  The other elements of the prima facie case are not disputed.

### ii.  Legitimate, Non-discriminatory Reason

The burden then shifts to defendants to articulate a legitimate, non-discriminatory reason for rejecting Mancuso's application.  Stimmel and DE advance multiple reasons: (1) Stimmel was wary of Mancuso's supposed $700,000 salary from a non-profit organization; (2) Stimmel believed the condominium rules prohibited renting to a corporation; and (3) Stimmel had concerns about the Mancusos' desire to bring in an electrician.  (Stimmel Dep. at 67-69, 71-73, 81-82, 90-91.)  These reasons satisfy defendants' burden.

### iii.  Pretext

Because defendants have articulated a legitimate, non-discriminatory reason, the burden shifts to plaintiffs to show that discrimination was the real reason for rejecting Mancuso's application.  Plaintiffs advance three main arguments: (1) Stimmel's asserted belief that the building did not allow leases to corporations is false; (2) Stimmel's concern about plaintiffs' offer being lower than the Coopers' offer is unfounded because Mancuso upped his offer upon hearing of the Coopers' offer; and (3) Voight indicated in recorded phone conversations with Mancuso that Stimmel did not select the Mancusos because of M.M.'s wheelchair and service dog.  (*See* Pl.'s DE Opp'n at 36-38; Pl.'s Stimmel Opp'n at 28-30.)

23

The examination of the last of these arguments demonstrates that triable issues of fact remain.  Plaintiffs rely on portions of the recorded conversations in which Voight referred to M.M.'s wheelchair and service dog as "deal killers," implied that Stimmel was "neurotic" about the wheelchair, and said that if Mancuso "didn't have anything, we already would have signed leases."  (Phone Call 121406 at 5:10-20; Phone Call 121506 at 11:12-24.)  DE notes that Voight clarified his remarks at his deposition, where he stated that he meant "if Mr. Mancuso did not have all the office equipment and if he agreed to the asking rent, we would have had a deal," and argues that consequently, the recordings do not raise a triable issue of fact.  (DE Reply at 11; Courtian Decl. in Opp'n to Pl.'s Motion for Partial Summary Judgment ("Courtian Opp'n Decl.") Ex. A. ("Voight Dep.") at 285:3-14.)  But in context, a reasonable jury could believe that Voight was referring to the wheelchair and the dog, as Mancuso refers to those them just before Voight's comment.  (*See* Phone Call 121506 at 12:15-24.)

Stimmel argues that Voight's comment is pure speculation and does not create an issue of material fact.  (Stimmel Reply at 6-9; *see also* Stimmel Mem. at 13-19.)  In support, Stimmel cites DE's answer to his cross-claim and Voight's deposition testimony, both of which imply that Stimmel never intended to discriminate against the Mancusos, (*see* Stimmel Mem. at 13-19), as well as *Woods v. Real Renters Ltd.*, No. 01 Civ. 0269 (MHD), 2007 WL 656907 (S.D.N.Y. Mar. 1, 2007).  In *Woods*, the plaintiffs' argument at the third step of the burden-shifting framework rested solely upon "a series of statements by Greig Bennett—the person who showed Ms. Woods the space—that he suspected that the landlord was motivated by race."  *Woods*, 2007 WL 656907, at *9.  Bennett's "only stated bases for what was concededly speculation on his part were" a question asking whether one plaintiff spoke in a manner that sounded African American posed after the plaintiff's rejection, and a comment by one of the defendant's representatives that

some elderly Jewish landlords were reluctant to rent to African Americans.  *Id.*  The court found that because "there is no competent evidence that [the landlord] was aware of plaintiffs' race, their discrimination claim cannot succeed."  *Id.* at *10.  Even Bennett's testimony "did not testify that plaintiff had any specific speaking style; indeed, he suggetsed [sic] the contrary."  *Id.*  The comments about elderly Jewish landlords were inapplicable to the case because they were inadmissible hearsay, they offered generalized stereotypes, and there was no evidence indicating that the landlord was either Jewish or elderly.  *Id.*

This case is distinguishable from *Woods*.  Unlike Bennett's statements in *Woods*, Voight's statements are not "concededly speculation."  Here, Voight testified that Stimmel told him that he was "concerned" about Apartment 1520 being "scratched up" by the wheelchair in conversations they had.  (Voight Dep. at 247:21-249:4.)  Whether Stimmel's "concern" about the wheelchair translated into a discriminatory motivation in rejecting Mancuso's application is not an issue appropriate for summary judgment.  Although a reasonable jury could interpret that concern as evincing no discriminatory intent, a reasonable jury could also find that Stimmel's decision to reject Mancuso had a discriminatory motive given Voight's recorded "deal killer" and "neurotic" comments.  Those comments find some factual basis in the record, and the Court cannot say that no discriminatory inference can be drawn from them as a matter of law.

### IV. Section 3604(c) Claims

#### A.  Standard

42 U.S.C. § 3604 makes it unlawful "[t]o make, print, or publish . . . any . . . statement . . . with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap [or] familial status . . . or an intention to make any such preference, limitation, or discrimination."  In determining whether a statement

violates section 3604(c), courts in the Second Circuit ask whether the statement suggests to an ordinary reader or listener that an unlawful discriminatory preference exists for the housing in question. *See Soules v. HUD*, 967 F.2d 817, 824 (2d Cir. 1992). "In cases where ads are clearly discriminatory, a court may look at an ad and determine whether it indicates an impermissible preference to an ordinary reader, and inquiry into the author's professed intent is largely unnecessary." *Soules*, 967 F.2d at 824. "Openly discriminatory oral statements merit similarly straightforward treatment." *Id.* However, where the statements are not facially discriminatory, "out of necessity courts must turn to other evidence in determining whether a violation of the FHA occurred" and examine the intent of the statement-maker.[11] *See id.* at 825. Evidence of intent "may prove especially helpful where . . . a court is charged with ascertaining the message sent by isolated words rather than a series of ads or an extended pattern of conduct." *Id.*

The relevant standard for interpreting comments that are alleged to be violations of section 3604(c) is one of the "ordinary listener." *Soules*, 967 F.2d at 824. The ordinary reader or listener is "neither the most suspicious nor the most insensitive of our citizenry." *Id.* And an ordinary listener hears statements in context. *Cf. Fordham v. Islip Union Free School Dist.*, 662 F. Supp. 2d 261, 274 (E.D.N.Y. 2009) (noting that in the defamation context, "the Court must view the statements in context as the literal meaning of the words does not always coincide with their meaning in a grander setting"); *Henneberry v. Sumitomo Corp. of America*, No. 04 Civ.

---

[11] Plaintiffs' papers reflect a confusion about the standard of law. Plaintiffs suggest that "[u]nder the 'ordinary listener' standard, the only instance in which Defendants' intent is ever considered if the statements uttered were facially non-discriminatory, *and* the context in which the statements were made was disputed." (Pls.' DE Reply at 4 (emphasis in original) (citing *Soules*, 967 F.2d at 825).) Although *Soules* did mention that the question of whether a statement was discriminatory depended "on the context and intent of the speaker," nothing in *Soules* sets up a two-part test for when to include evidence of intent. *See Soules*, 967 F.2d at 825. Instead, the Second Circuit in *Soules* approved of the procedure used in the case, which turned to evidence of intent after a finding that the statements at issue were not facially discriminatory: "In this case, after stating that the statements made by Downs facially did not indicate a limitation, preference or discrimination based on familial status, the ALJ inquired whether Downs' intent was discriminatory by examining whether her reasons for making her statements were legitimate and nondiscriminatory rather than pretextual. This procedure was not improper." *Id.*

2128 (PKL), 2005 WL 991772, at *18 (S.D.N.Y. Apr. 27, 2005) (remarking that in the

defamation context, "the Court should examine the material in question from the perspective of

an ordinary listener" and consider the statements "in the immediate context of the

communication as a whole and the broader context in which the statements were published").

**B.  Apartment 2020**

Plaintiffs moves for summary judgment on their section 3604(c) claim based on the

recorded phone conversation between Mancuso and Kouperman about Apartment 2020; DE also

moves for summary judgment.  In particular, plaintiffs focus on Kouperman's statement that

"this is a condo with an individual owner and it's his choice on whether or not he allows a pet in

his apartment."  (Phone Call 122006 at 10:15-17.)  Plaintiffs contend that this statement clearly

conveys to an ordinary person "an impermissible preference, limitation, or discrimination against

an individual with a service dog."  (Pl.'s Mem. at 17.)  DE argues that Kouperman's comments

must be taken in context, and that in context, they do not convey to an ordinary person an

impermissible preference.  (DE Opp'n at 21-24.)

The Court agrees with DE.  At least facially, Kouperman's comments do not clearly

convey an impermissible preference to an ordinary person.  Read in context, Kouperman's

comments can be read to be articulating a simple "no-pet" rule.  Read this way, as the

conversation continued, Kouperman began to realize that the Mancusos' dog might not be simply

classified as a pet and therefore softened her stance.  In particular, just two lines after the

comments on which plaintiffs focus, Kouperman says in the recorded conversation, "I

understand your point.  It's not really a pet, per se."  (Phone Call 122006 at 10:20-21.)

Kouperman's comments therefore can reasonably be read as her misunderstanding whether

Mancuso's dog was a pet or a service dog, and therefore are not facially discriminatory.  *Cf.*

*Hawn v. Shoreline Towers Phase I Condo. Ass'n, Inc.*, No. 3:07-cv-97/RV/EMT, 2009 WL

691378, at *3 (N.D. Fla. Mar. 12, 2009) ("[A] sign that says 'no animals' instead of 'no pets'

simply does not, by itself, reflect an intentional preference, limitation, or discrimination based on

handicap in violation of the FHA."), *aff'd*, 347 F. App'x 464 (11th Cir. 2009).

The Court must then inquire into whether Kouperman's intent was to make a

discriminatory statement. *Soules*, 967 F.2d at 825.  But for the same reasons adduced above in

the discussion of plaintiffs' discrimination claims with respect to the renting of Apartment 2020,

plaintiffs have failed to show a triable issue of fact with respect to whether Kouperman had a

discriminatory intent when she made the statements in question.  Accordingly, summary

judgment for defendants is granted on the Section 3604(c) claim with respect to Apartment 2020.

### C. Apartment 1520

Based on the recorded conversations between Voight and Mancuso, plaintiffs move for

partial summary judgment on their section 3604(c) claim with respect to Apartment 1520; DE

moves for summary judgment on this claim as well.  Plaintiffs focus on four parts of the recorded

conversations.  First, plaintiffs focus on several comments made by Voight that indicated that the

potential damage that the wheelchair might cause to the apartment could be a "deal killer."  For

example, Voight and Mancuso have this exchange:

> MR. MANCUSO: Um, you said that the deal killer was, uh, the daughter, uh, the
> wheelchair and the dog.
> MR. VOIGHT: Yeah, they were really concerned about scraping up things.
> They—they feel bad about, you know, the daughter and everything but he was
> just—they—he's just trying to protect his apartment, that's all.

(Phone Call 121406 at 2:24-3:06.)  Later in the conversation, Voight and Mancuso have the

following exchange:

> MR. MANCUSO: Yeah. Uh, is it—is it a deal killer, that's the question because if
> it—[interposing]

> MR. VOIGHT: That's been—yeah, it's gonna be kind of the deal killer, yeah.
> MR. MANCUSO: It is a deal killer?  Wow.
> MR. VOIGHT: [Stimmel] just—he seems to be really concerned about that—that—he's not upset.  He's not angry.  He feels bad for having that viewpoint because of your daughter's unfortunate situation.

(Phone Call 121406 at 05:10-05:20).

Second, plaintiffs claim that Voight made comments that "clearly indicate a preference for, and limitation to, a tenant who does not use a wheelchair, own a service dog, or a family with more than one child."  (Pl.'s Mem. at 14.)  That claim is based on the following exchange:

> MR. VOIGHT: And, uh, uh, we're gonna see if—uh, he liked the fact that they have just one person.  Uh, they have a—they're married and with a—with a son.
> MR. MANCUSO: No dog and no wheelchair.
> MR. VOIGHT: No, nothing like that.  He's very comfortable with that.

(Phone Call 121506 at 3:09-3:15.)

Plaintiffs also focus on Voight's statement that "we looked into that and an owner can choose whoever he wants." (Phone Call 121406 at 20:11-12), and his statement in a subsequent conversation that "[i]f you didn't have anything, we already would have signed leases."  (Phone Call 121506 at 11:23-24.)  According to plaintiffs, no reasonable jury could find that all of these statements do not express to the ordinary listener a discriminatory preference based on disability or familial status.

But these excerpts are only "isolated words," and when faced with such situations, the Second Circuit has instructed that evidence of intent is "especially helpful."  *Soules*, 967 F.2d at 825.  Certainly, from looking at those excerpts, a reasonable jury could conclude that the excerpted statements convey a discriminatory preference based on disability, as the Court has concluded above with respect to plaintiffs' claim of discrimination in attempting to rent Apartment 1520.  But to say that no reasonable jury could conclude otherwise ignores the larger context of the recorded phone calls.  Several parts of the conversation containing the "deal killer"

comments reveal a more general concern with damages to the apartment, rather than a particular

animus toward the disabled status of the Mancusos' daughter and the service dog.  For example,

Mancuso and Voight have this exchange:

> MR. MANCUSO: The floor never is a problem, it's the door.  It's the door at the
> same height as the wheelchair where it hits the thing.  And, um, and you could get
> a scratch.  I mean we haven't had one in four years here.  But we go to other
> people who have wheelchair—kids that are disabled and some of them have these
> plastic covers, hard—it looks like glass—cover over a certain section of the door.
> It's only about 8, 10 inches of plastic.  And, uh, if it ever hits there, it just hits the
> plastic and then when you leave, you just peel the plastic off.  They stick on.
> They're really easy to put on, you know like glue on.
> MR. VOIGHT: Uh-huh.  Well, so, that is something.  That's—that's workable.
> My old boss owned a lot of apartments at the Incernia [phonetic], which is on the
> upper west side.  And we had this one apartment, this huge apartment in the
> building that we rented out to Macaulay Culkin—
> MR. MANCUSO: Yeah.
> MR. VOIGHT: —the actor.  And he brought in 19 exotic animals into his
> apartment.  And they crapped all over the floor, the hardwood floors and ruined
> them.

(Phone Call 121406 at 21:15-22:16.)  That exchange reasonably can be read to show that as long

as Stimmel's general concerns about damage are met, then the Mancusos' application is

"workable."  That reading is corroborated by Voight's comment shortly after the second "deal

killer" exchange:

> MR. MANCUSO: Well, you know I appreciate it from his point of view because,
> uh, you know; I mean it's a killer.  I mean it really limits, uh, you know what we
> can do with him, you know.  But if you say that is gonna put us out of the
> running, then, uh, you know we have to go to another—[interposing]
> MR. VOIGHT: Out of the running, you just—you just—it's not helping.  I guess
> that's—I can talk to him about the door thing.  That—you know that's certainly a
> good possibility.

(Phone Call 121406 at 5:21-6:6.)  There, Voight indicates that the wheelchair and dog do not

necessarily put Mancuso "out of the running" and that a "good possibility" exists with the

addition of the plastic door guard.  Furthermore, on multiple occasions, Mancuso implied that

Stimmel has a discriminatory bias against his daughter because of her disability and sought

confirmation from Voight on that point, but Voight never expressly acknowledged such a bias. For example, Mancuso asked Voight, "So, he—this is the first time he's renting, so you think he's a little biased against, uh, this, uh, dog, uh, wheelchair?" (*Id.* at 10:16-19.)  Voight answered, "He's just nervous, period." (*Id.* at 20.)  Mancuso also asked more directly, "You sure he's not, uh, you know prej—is he prejudiced against you think, maybe?  I mean, you know, maybe a little bit, could be?" (*Id.* at 23:11-14.)  And Voight answered that question more unequivocally: "No, he never once said anything derogatory about that, ever." (*Id.* at 23:15-16.)

Context also affects the other recorded comments as well.  Regarding the comments about an owner being able to do "whatever he wants," prior to that line being uttered, Voight and Mancuso engaged in a conversation about when and if co-ops can be sued for discriminatory preferences in housing.  (*See* Phone Call 121406 at 18:10-19:23.)  That conversation led to this exchange:

> MR. MANCUSO: Well, uh, in this case, does this guy know that you can't, uh, discriminate against disabled people? You know he could get sued.
> MR. VOIGHT: Well, I—
> MR. MANCUSO: I mean I'm asking you—between you and me.
> MR. VOIGHT: Talked about it, but I don't think, uh—
> MR. MANCUSO: It's not true in condos is it? Is that same law true?

(*Id.* at 19:24-20:9.)  After the "whatever he wants" comment, Mancuso asks a follow-up question: "The co-op's different though than a condo, huh?" (*Id.* at 20:16-17.)

Taken in context, it is not clear that Voight's comment even refers to the owner of Apartment 1520, as opposed to condominium owners more generally.  Nor is it clear that the comment conveys a discriminatory preference about prospective renters of that apartment.  A broker's statement that an owner can "do what he wants," even if an incorrect statement of the law, does not necessarily lead to the inference that the owner has an unlawful discriminatory preference.

Finally, regarding Voight's implication that plaintiffs "would have signed leases," a reasonable jury could, in context, interpret Voight's comments as regret over the delay caused by the Mancusos' application.  The application included complicating factors apart from the wheelchair and the dog that delayed it, such as Mancuso's offering price and his desire to rent in the name of a corporation.  A reasonable jury could interpret Voight as saying that if Mancuso had a less complicated application overall, then perhaps a deal could have been consummated before the Coopers entered the picture.  Indeed, Voight's own explanation of these comments is that "if Mr. Mancuso did not have all the office equipment and if he agreed to the asking rent, we would have had a deal."  (Voight Dep. at 285:3-14.)  While a reasonable jury might choose to disbelieve Voight's explanation, on summary judgment "the court 'may not make credibility determinations or weigh the evidence . . . .'"  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (emphasis removed).   This comment, then, does not clearly convey a discriminatory preference, and plaintiffs' motion for summary judgment is denied.[12]

### V.  Other Issues

Three issues remain: the scope of agency relationships amongst the parties involved in this action, whether a defense of "unclean hands" can be asserted under the FHA, and defendant's motion to preclude damages based on plaintiffs' lost profits.

### A.  Agency and the Adverse Interest Exception

DE and Stimmel argue that they cannot be held liable for Voight's acts under the law of agency.[13]

---

[12] This section has largely addressed plaintiffs' summary judgment motion, but for the reasons stated above in Section III.B.iii, DE's motion for summary judgment must also be denied, as a reasonable jury could also interpret Voight's comments to evince a discriminatory preference.

[13] DE, Maidan, and Talel also make an agency argument with respect to Kouperman's actions, but because the Court grants summary judgment on their substantive claims, it is unnecessary to address their agency arguments.

### i.  Standard

"[T]he question whether an agency relationship exists for purposes of the Fair Housing Act is determined under federal law."  *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006); *see also Meyer v. Holley*, 537 U.S. 280, 285-86 (2003) (using "traditional vicarious liability rules" in an FHA case).  Under federal law, agency "depends on the existence of three elements: (1) 'the manifestation by the principal that the agent shall act for him'; (2) 'the agent's acceptance of the undertaking'; *and* (3) 'the understanding of the parties that the principal is to be in control of the undertaking.'"  *Id.* (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 385 (2d Cir. 1994)).  Agency is a "highly factual" inquiry and "can turn on a number of factors," including "the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done."  *Id.*

Plaintiff contends that DE is vicariously liable for Voight's acts.[14]  DE does not argue that Voight does not fit the general definition of an agent, but instead argues that it is not vicariously liable for his actions based on the "adverse interest exception."  (*See, e.g.*, DE's Opp'n to Pl.'s Motion for Partial Summary Judgment at 24-25.)  Generally, "[o]ne whose interests are adverse to those of another can be authorized to act on behalf of the other; it is a breach of duty for him so to act without revealing the existence and extent of such adverse interests."  Restatement (Second) of Agency § 23.  "The fact that the agent has interests adverse

---

[14] Both DE and plaintiffs mix in direct liability arguments with vicarious liability arguments.  (*See, e.g.*, DE Mem. at 20-22; Pl.'s DE Opp'n at 13-16.)  Plaintiffs, however, have presented no evidence that DE, apart from Kouperman and Voight, was ever even aware of M.M.'s wheelchair and service dog prior to the events of which plaintiff complains in this action.  Arguments such as plaintiffs' that "perhaps it is more than coincidence that Defendant Voight and Kouperman . . . stated to Mr. Mancuso that it is perfectly lawful for an apartment owner to discriminate" are pure speculation and do not create a triable issue of fact.  (Pl.'s DE Opp'n at 15.)  Accordingly, summary judgment is granted on any claim for direct liability against DE.  *See Cleveland*, 448 F.3d at 523 (noting that "knowledge of a plaintiff's" protected status "is a component of direct liability under the FHA").

to the principal does not affect his power to bind the principal to third persons who have no notice of the adverse interests." *Id.* § 23, cmt. a. But "[u]nder New York law, the adverse interest exception rebuts the usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000); *see also* Restatement (Third) of Agency § 5.04 ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person."). The "theory is that 'where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it.'" *Id.* (citing *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936)). "The adverse interest exception, however, is narrow and applies only when the agent has 'totally abandoned' the principal's interests." *Id.* (citing *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997)).

Even assuming that the adverse interest exception applies, however, it would not apply with respect to Voight's agency. The exception is narrowly construed and "cannot be invoked merely because he [the agent] has a conflict of interest or because he is not acting primarily for his principal." *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 830 (N.Y. 1985). DE argues that Voight totally abandoned DE's interests because DE trained him not to violate housing discrimination laws, and he may have done so. But this is not an argument that he has totally abandoned DE's interests. DE's evidence shows that Voight's actions may have been contrary to general training and caused adverse consequences to DE, but not that he at any time "totally abandoned" DE's interests. Essentially, DE's argument is that the adverse interest exception is

34

properly invoked when a principal instructs his agent generally not to violate the law, but the agent nevertheless does. This argument is not in keeping with the "narrow" nature of the exception. *Wight*, 219 F.3d at 87.

DE's only other argument about agency, that it cannot be vicariously liable "because it did not make or authorize [Voight and Kouperman's] actions," is foreclosed by *Cabrera*. There, the Second Circuit held that a principal "did not have to authorize" an agent "specifically to discriminate in order to be liable for that discrimination." *Cabrera*, 24 F.3d at 389. This argument, therefore, has no basis in law.

Stimmel also does not argue that Voight does not fit the general definition of an agent, but argues instead that the adverse interest exception applies to his relationship with Voight because Voight was "trying to advance his own career goals," was "very much interested in joining the CEO Clubs," and "deliberately hid from Stimmel the fact that Mancuso has a prior bankruptcy filing." (Stimmel Mem. at 20-21.) This also fails to invoke the adverse interest exception, assuming, again, that it applies at all. Even taking all of Stimmel's arguments as true, they permit only the inference that Stimmel acquired an adverse interest, namely pleasing Mancuso to get into the CEO Clubs, not one that Voight totally abandoned Stimmel's interests in his dealings with Mancuso. That inference is only one that Voight "has a conflict of interest or . . . is not acting primarily for his principal," but that does not suffice to invoke the adverse interest exception. *Center*, 488 N.E.2d at 830; *see also In re Crazy Eddie Secs. Litig.*, 802 F. Supp. 804, 817 (E.D.N.Y. 1992) ("This 'adverse interest' exception is not applicable when the agent acts both for himself and for the principal, though his primary interest is inimical to the principal.").

**B. Unclean Hands**

Plaintiffs also argue that the defense of unclean hands has no place in an FHA case.  (*See, e.g.*, Pl.'s DE Opp'n at 28-33.)  Plaintiffs rely principally on the Supreme Court's decision in *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995).  In *McKennon*, the Court considered the question of "whether all relief must be denied when an employer has been discharged in violation of the [Age Discrimination in Employment Act ("ADEA")] and the employer later discovers some wrongful conduct that would have led to discharge if it had been discovered earlier."  513 U.S. at 356.  The district court and Sixth Circuit below had both held that no remedy was available to the plaintiff in the case since her misconduct would have been sufficient grounds for her termination.  *Id.* at 355.  The Supreme Court reversed, holding that "[i]t would not accord with th[e] scheme [of anti-discrimination lawsuits] if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act."  *Id.* at 358.  The Court further noted that "[t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason."  *Id.* at 360.  Although the Court held that after-acquired evidence was irrelevant on the issue of liability in an ADEA suit, it allowed consideration of that evidence in fashioning the appropriate remedy in such suits.  *See id.* at 360-63.

Although *McKennon* was an ADEA case, the Second Circuit has noted that its rationale is applicable in a Title VII context as well.  *Vichare v. AMBAC Inc.*, 106 F.3d 457, 468 n.5 (2d Cir. 1996).  No court in this Circuit appears to have considered the question of whether the rationale of *McKennon* bars the unclean hands doctrine in an FHA case.  The few cases that have considered the question have held that *McKennon*'s rationale does apply.  *See Ramirez v.*

*Greenpoint Mortg. Funding, Inc.*, 268 F.R.D. 627, 638 (N.D. Cal. 2010) ("[T]his Court finds that

the rationale of *McKennon* is clearly applicable to . . . the FHA, which—like the ADEA—

reflect[s] Congress's authorization of 'broad equitable relief to serve important national

policies.'" (quoting *McKennon*, 513 U.S. at 360)); *Utah Labor Comm'n v. Paradise Town*, 660

F. Supp. 2d 1256, 1263 (D. Utah 2009) ("Moreover, the unclean hands defense does not apply

here. As stated by the Supreme Court, '[w]e have rejected the unclean hands defense where a

private suit serves important public purposes.' Clearly, ensuring that disabled people enjoy equal

rights to housing is an important public purpose." (internal quotation marks omitted) (quoting

*McKennon*, 513 U.S. at 360-61)).  DE cites *Beaulialice v. Federal Home Loan Mortgage Corp.*,

No. 8:04-CV-2316-T-24-EAJ, 2007 WL 744646 (M.D. Fla. Mar. 6, 2007), for the proposition

that "[a]t least one court outside the Second Circuit has applied the unclean hands defense to a

FHA claim."[15]  (DE Reply at 19.)  *Beaulialice* did apply the doctrine, but the case also did not

consider whether *McKennon* applied and is therefore unpersuasive for application to this case.

The Court therefore finds that the doctrine of unclean hands is inapplicable to the liability issues

in this case, in accordance with the weight of case law.

### C. Lost Profits

Finally, DE moves to strike plaintiffs' claims for damages stemming from alleged lost

business opportunities, lost profits, and loss of CEO Clubs membership.  Plaintiffs failed to

oppose DE in this regard, but it appears from Mancuso's deposition testimony that this claim for

damages is based on "losing face" in front of a group of mayors of Chinese cities.  (*See, e.g.*,

Mancuso Dep. at 376:19-377:8.)  According to Mancuso, the "crappy location of 4 West 22nd

Street" caused him to lose face in front of these mayors; the mayors therefore "thought Mancuso

is not such a big deal," which was "a major contributing factor" to certain cities dropping out of

---

[15] Stimmel apparently ignored plaintiffs' argument on this point.  (*See* Stimmel Reply at 3-6.)

deals to give land to CEO Clubs for free or for vastly discounted prices.  (*See* Mancuso Dep. at 375:12-378:14.)  These deals would have been worth "millions of dollars in damages" in Mancuso's estimation, although Mancuso was unable to say how much money he is currently making from comparable deals that did close in spite of the events of this litigation.  (*Id.* at 381:12-383:19.)  Mancuso also claims that because of his West 22nd Street location, people who otherwise would have joined the CEO Clubs refused.  (*Id.* at 385:9-386:6.)

As an initial matter, it seems doubtful that plaintiffs have pled a claim for lost profits properly.  "A damages action under the [fair housing] statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."  *Curtis v. Loether*, 415 U.S. 189, 195 (1974); *see also Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1234 (D.C. Cir. 1997) ("[A]n action for damages under § 813 may be analogous to several different tort actions recognized at common law . . . .").  Federal Rule of Civil Procedure 9(g) requires that "[i]f an item of special damage is claimed, it must be specifically stated."  Special damages are "damages that are unusual for the type of claim in question—that are not the natural damages associated with such a claim."  *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219 (7th Cir. 1995).  And "lost profits are normal in contract cases, unusual in personal-injury tort cases."  *Id.*  The Second Amended Complaint in this action mentions nothing about China, membership, lost profits, or lost business opportunities and fails to plead plaintiffs' lost profits claim at all, let alone "specifically."

Even if the lost-profits claim were sufficiently pleaded, however, it would be too speculative in this case.  "In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of

damages.  He need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork."  *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).  "Lost profits, though typically 'difficult to prove with exactitude,' may be recovered 'to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.'"  *Id.* (quoting *Gargano v. Heyman,* 525 A.2d 1343, 1346 (Conn. 1987)); *see also Samaritan Inns*, 114 F.3d at 1235 ("[W]hile a plaintiff seeking to recover lost profits must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable estimate.").

Here, the Court cannot find that the lost profits plaintiffs claim can be shown with reasonable certainty.  Plaintiffs present no testimony from anyone with firsthand knowledge about why these Chinese mayors decided not to go through with deals with Mancuso.  Plaintiffs' sole evidence relating to their supposed lost profits comes in the form of Mancuso's deposition testimony, which speculates that his West 22nd Street apartment caused him to "lose face" and, in turn, projects in China.  At his deposition, Mancuso could not estimate the worth of these deals with any reasonable degree of particularity.  For comparable deals, Mancuso articulated only that they were going to make "millions of dollars."  (Mancuso Dep. at 382:18-383:3.) Mancuso also admitted in his deposition that he did not "have firsthand knowledge" as to the damage he suffered as a result of losing the projects with the Chinese mayors.  (*Id.* at 380:19-24.) Furthermore, even in Mancuso's estimation, other factors contributed to him losing these deals, and he might still have an opportunity to strike up new deals with these Chinese mayors.  (*Id.* at 384:20-385:8, 787:17-788:12.)  Plaintiffs also chose to live at West 22nd Street, at least in part, because it was closer to a possible school M.M. would attend.  (First Courtian Aff. Ex. D at 200:21-25.)  Mancuso's testimony about lost memberships is also vague; Mancuso claims that

that CEO Clubs lost about $100,000 because of the West 22nd Street location, but offers mainly

subjective *ipse dixit* to support this conclusion.  (*See* Mancuso Dep at 392:19-396:17.)  His own

words do not point to the location as being the sole reason or even the primary reason for

potential members choosing not to join the CEO Clubs, but only a "major contributing factor."

(*Id.* at 396:6-17.)

On both the issue of lost profits and business opportunities in China and lost

memberships in the United States, then, plaintiffs have failed to offer any evidence that would

allow the trier of fact to determine the amount of damages with any degree of reasonable

certainty.  Accordingly, these claims are stricken.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the motions for summary judgment of defendants Maidan and Talel [153]. The Court DENIES Stimmel's motion for summary judgment [159], and GRANTS in part and DENIES in part DE's motion for summary judgment [149]. Plaintiffs' claims for lost profits, business opportunities, and membership are insufficient as a matter of law, and claims relating to the Mancusos' attempt to rent Apartment 2020 and defendant Kouperman are dismissed. Plaintiffs' motion for partial summary judgment [164] is DENIED.


SO ORDERED.

Dated: New York, New York
       August **24**, 2011

_____
Richard J. Holwell
United States District Judge

41